ROBERT CORN-REVERE, bobcornrevere@dwt.com (*pro hac vice pending*)
RONALD G. LONDON, ronnielondon@dwt.com (*pro hac vice pending*)
LISA B. ZYCHERMAN, lisazycherman@dwt.com (*pro hac vice pending*)
*Attorneys for Plaintiffs*
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006-3401
(202) 973-4200

JEROME H. MOONEY, jerrym@mooneylaw.com, Utah State Bar# 2303
*Attorneys for Plaintiffs*
WESTON, GARROU & MOONEY
12121 Wilshire Blvd., Suite 525
Los Angeles, CA 90025
(310) 442-0072

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| **WILLIAM JERGINS, JOEY GILLESPIE,** and **FORREST GEE,** | ) ) ) | |
| Plaintiffs, | ) ) | No. |
| v. | ) ) | **COMPLAINT FOR INJUNCTIVE** |
| | ) | **AND DECLARATORY RELIEF** |
| **RICHARD B. WILLIAMS,** | ) | **AND DAMAGES** |
| **DEL W. BEATTY, DEBBIE MILLET,** | ) | |
| **SETH GUBLER, JORDAN SHARP,** | ) | **JURY TRIAL DEMANDED** |
| **SHARON LEE, DON REID, and** | ) | |
| **DOE DEFENDANT 1,** | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs William Jergins, Joey Gillespie, and Forrest Gee complain of Defendants and

allege:

## I.    INTRODUCTION

1.    This is a civil rights action to protect and vindicate the First and Fourteenth Amendment rights of William Jergins, Joey Gillespie, Forrest Gee and their fellow students at Dixie State University ("Dixie State"), including other members of Young Americans for Liberty ("YAL").   By policy and practice, Dixie State unlawfully restricts its students' constitutional rights to free expression and has acted in the past to restrict the Plaintiffs' constitutional rights. Accordingly, Dixie State's policies and enforcement practices are challenged on their face and as applied to the Plaintiffs.

2.    Dixie State, a public institution, has adopted and enforced excessive restrictions on the rights of student organizations, and limited student speech in open areas of the campus. University officials refused to allow Plaintiffs to post flyers with unflattering depictions of Presidents George W. Bush, Barack Obama, and revolutionary Che Guevara because Dixie State does not allow students to "disparage" others.   Further, Dixie State unconstitutionally restricts access to open areas on campus for expressive activities by requiring that students request permission to speak several weeks in advance.   And once approved, Plaintiffs were relegated to a previously unknown "free speech zone" that comprises only around 0.1% of Dixie State University's 100-acre campus.

3.    The policies at issue in this case, like those currently enforced at many public universities, ignore the Supreme Court's repeated affirmations that "state colleges and universities are not enclaves immune from the sweep of the First Amendment," *Healy v. James*, 408 U.S. 169, 180 (1972), and that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools."  *Shelton v. Tucker*, 364 U.S.

479, 487 (1960).  In the misguided belief that students and faculty members must be cushioned from ideas they may find disagreeable, many schools have adopted policies under various titles that amount to "speech codes," premised on the erroneous notion that there is a right not to be offended.  Likewise, many universities impose unwarranted restrictions on student organizations out of an undifferentiated concern that such associations might in some way be disruptive.  And many schools employ a morass of regulations to regulate and restrict speech in open areas of their campuses despite the fact that such space has long been recognized as a type of public forum.  *See*, *e.g*., *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981).  The truncated spaces where students may be allowed to exercise their constitutional rights are ironically named "free speech zones."  Such restrictions ignore the well-settled principles that "state-operated schools may not be enclaves of totalitarianism" and that neither "students [nor] teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  *Tinker v. Des Moines Indep. Comm. Sch. Dist*., 393 U.S. 503, 506, 511 (1969).

## II.     JURISDICTION AND VENUE

4.     This action arises under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988.

5.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

6.     This Court has authority to grant the requested declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

7.     This Court has authority to issue the requested injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

8.      This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

9.      Venue is proper in the United States District Court for the District of Utah, Central Division pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred within this District and because at least one Defendant resides in this District.

### III.     PLAINTIFFS

10.     Plaintiff William Jergins is a resident of St. George, Utah, and a student at Dixie State University.  He is the current president of the YAL chapter at Dixie State.

11.     Plaintiff Joey Gillespie is a resident of St. George, Utah, and a student at Dixie State University.  Ms. Gillespie is currently the Secretary of the YAL Chapter at Dixie State.

12.     Plaintiff Forrest Gee is a resident of St. George, Utah, and a student at Dixie State University.  Mr. Gee is currently a member of the YAL Chapter at Dixie State.

### IV.     DEFENDANTS

13.     Defendant Richard B. Williams is the President of Dixie State University, a public institution operating under the laws of Utah.  He is Dixie State's chief executive officer, responsible for the University's administration and policy-making and has ultimate authority to approve the policies and procedures challenged herein that were applied to deprive Plaintiffs of their constitutional rights.  Defendant Williams acted under color of state law and is sued for injunctive relief in his official capacity.

14.     Defendant Del W. Beatty is Dean of Students at Dixie State.  Defendant Beatty acted under color of state law and is sued in both his personal and official capacities.

15.     Defendant Debbie Millet is the Administrative Assistant to the Dean of Students at Dixie State.  Defendant Millet acted under color of state law and is sued in both her personal and official capacities.

16.     Defendant Seth Gubler is the Director of Housing and Resident Life at Dixie State.  Defendant Gubler acted under color of state law and is sued for injunctive relief in his official capacity.

17.     Defendant Jordon Sharp is Director of Student Involvement and Leadership at Dixie State.  Defendant Sharp acted under color of state law and is sued in both his personal and official capacities.

18.     Defendant Sharon Lee is Coordinator of Academic Scheduling at Dixie State.  Defendant Lee acted under color of state law and is sued in both her personal and official capacities.

19.     Defendant Don Reid is Director of Public Safety at Dixie State.  Defendant Reid acted under color of state law and is sued in both his personal and official capacities.

20.     Doe Defendant 1 is a member of the Dixie State campus police force.  Doe Defendant 1 acted under color of state law and is sued in both his personal and official capacities.

## V.     STATEMENT OF FACTS

### A.     Unconstitutional Flyer Approval Process

#### 1.     Defendants' Application of the General Posting Policy to Censor Plaintiffs' Speech

21.     The Dixie State YAL chapter is an approved student club and is thus subject to various policies and procedures.

5

22.    YAL is a "pro-liberty organization on America's college campuses" that has "more than 570 YAL chapters and 204,000 youth activists nationwide."   *See* http://www.yaliberty.org/about.   Plaintiffs hold weekly YAL club meetings at Dixie State and publicize those meetings via flyers posted on the Dixie State campus.

23.    In October 2014, Plaintiffs attempted to promote their upcoming meetings via three flyers.

24.    Dixie State policies and procedures require students to obtain approval from the Dean of Students before posting any flyers on campus.

25.    Plaintiff Jergins requested approval to post the three flyers described in paragraphs 26-28 on October 13, 2014.

26.    The first flyer stated "Learn to hold your leaders accountable" and featured a photograph of President George W. Bush with the caption "MISS ME YET?" next to a photograph of a cat with the caption "WHY AREN'T YOU IN PRISON?"   A copy of the first flyer is attached as Exhibit A.

27.    The second flyer included a photograph of President Barak Obama yelling into a microphone with the words "Get in my BELLYYYY!" over the caption "Don't be consumed by the state!"   A copy of the second flyer is attached as Exhibit B.

28.    The third flyer featured a black and white drawing of Che Guevara, overlaying a circle with a slash through it, *i.e.* an international warning sign.   Next to the drawing was the text: "REAL REBELS DON'T SUPPORT CENTRALIZED STATE AUTHORITY."   Below, the flyer stated "No More Che Day/You've seen him on Shirts. You've seen him on Mugs.   Now

see him as he really is with Young Americans for Liberty."  A copy of the third flyer is attached as Exhibit C.

29.    The three flyers were reviewed by Defendants Beatty and Millet but denied approval because they "mocked individuals" in violation of Dixie State policies.

30.    On October 30, 2014, Defendant Millet stated that the flyers would be approved if Plaintiff Jergins removed the images of Presidents Bush and Obama and Che Guevara.

31.    In response to Defendant Millet's instruction, Plaintiff Jergins removed the images from the three flyers in order to obtain approval to distribute them.

32.    As a direct result of Defendants Beatty and Millet's actions, Plaintiffs were unable to freely express their beliefs and their outreach efforts were curtailed for fear of being punished under Dixie State policies.

## 2.    Dixie State's Unconstitutional Posting Policies

33.    Dixie State enforces at least two posting policies that limit student expression on campus.  First, Dixie State has promulgated General Posting and Advertising Guidelines ("General Posting Policy") for all postings in general campus areas.  Second, Dixie State has promulgated a posting policy set forth in the university's Resident Life Handbook Rules and Regulations ("Resident Life Posting Policy").  In this Complaint, these policies are collectively referred to as the "Posting Policies."

### a.    General Posting Policy

34.    Dixie State's General Posting Policy provides that the Dean of Students office must approve "All posters, large banners or any other medium used to advertise," student club events including "banners, lawn signs, handbill distribution" and tables.  *See* Exhibit D.  All

advertising "must contain the sponsor's name, contact name and phone number" and "should be computer generated or professionally produced."

35.     Approved postings may only be placed on bulletin boards marked for "General Posting" provided by the University.  *See* Exhibit E ("Dixie State University Bulletin Boards" hand-out).  Postings are prohibited on "doors, walls (painted or brick), windows or glass" as well as "in classrooms and on automobiles."

36.     Additional steps are required to post flyers at buildings with high numbers of visitors.  If a student wishes to advertise an event "in academic or administrative buildings or on departmental boards" they must obtain "prior approval for a departmental board" before seeking approval from the Dean of Students Office.  The departmental board approval process is unspecified.

37.     The General Posting Policy requires that "Materials must be in good taste (FCC guidelines), adhere to campus policy, look professional, and not detract from the campus appearance."  The General Posting Policy further prohibits materials that "single out any individual group(s) or entities in a derogatory manner."

38.     The policy does not define "good taste," other than to equate it with unspecified "FCC guidelines."  Nor does the General Posting Policy define what it means to be "professional" or "derogatory," leaving the Defendants with unlimited discretion to expand or restrict the definitions of "good taste," "professional," and "derogatory" to sanction speech they do not like or allow speech with which they agree.

39.     The General Posting Policy lacks criteria to guide administrators' decisions whether to approve posters or any other advertising materials and gives them the authority to deny approval where postings do not comport with undefined and vague speech prohibitions.

40.     Dixie State does not "approve the advertising of events or services that are in direct competition with events or services provided by Dixie State University."  If a student activity is scheduled for the same time as an event that a university administrator considers to be more important, the student event cannot be advertised if Defendants deem it to be "in competition with" a Dixie State event.

41.     The General Posting Policy provides no guidance on the time needed to obtain approval of postings.  However, any student club at Dixie State wishing to post flyers or posters must first obtain approval of their event via an "Activity Approval Guide," which must be completed weeks prior to the date of the event.

42.     Once a student club obtains approval for their event, they may seek approval of advertising materials from the Dean of Students pursuant to the General Posting Policy. Accordingly, under Dixie State policies, flyers, posters, or other materials for impromptu expression or impromptu expressive activities may not be posted because there is no mechanism for immediate approval.

43.     Dixie State reserves the right to remove any posted materials that do not meet the guidelines set forth in its General Posting Policy.

44.     The General Posting Policy thus allows Dixie State administrators to censor flyers with messages of which they do not approve.

**b.      Resident Life Posting Policy**

45.      The Dixie State posting policies also apply to "all materials intended to be posted in the Resident Life Area," pursuant to the Resident Life Posting Policy.  *See* Exhibit F.

46.      The Resident Life Posting Policy provides that materials will not be approved that the Office of Resident Life "deem[s] to be racist, sexist, indecent, scandalous, illegal, inciting, advertising alcohol or illegal substances, or in any way oppressive in nature."

47.      The Resident Life Posting Policy does not define what it means to be "racist," "sexist," "indecent," "scandalous," "inciting," or "oppressive in nature," leaving the Defendants with unlimited discretion to expand or restrict those definitions to sanction speech they do not like or allow speech with which they agree.

48.      Further, the Office of Resident Life will not approve, or will remove "posters or notices that, in their judgment are offensive, inappropriate or demeaning."

49.      The Resident Life Posting Policy does not define what it means to be "offensive," "inappropriate," or "demeaning," leaving Defendants with discretion to expand or restrict those definitions to sanction speech they do not like or allow speech with which they agree.  Nor does the policy provide any type of threshold that speech must reach to meet these standards, allowing the policy to be enforced on the basis of hurt feelings, subjective beliefs, and alleged mental or emotional harm.

50.       The Resident Life Posting Policy further prohibits postings with messages that "could cause damage, an uncomfortable, or threatening environment for staff, employees, residents, or members of the community."

51.     The policy does not define or otherwise explain how the content of postings might be deemed to "cause damage, an uncomfortable, or threatening environment…."  Nor does the policy provide any type of threshold that speech must reach to meet these standards, allowing the policy to be enforced on the basis of hurt feelings, subjective beliefs, and alleged mental or emotional harm.

52.     The Resident Life Posting Policy lacks criteria to guide administrators' decisions whether to approve posters and gives them the authority to deny approval where postings do not comport with undefined and vague speech prohibitions.

53.     The Resident Life Posting Policy provides no guidance on the time needed to obtain approval of postings.

54.     The Office of Resident Life reserves the "right to deny approval of, or remove any posters or notices that" fail to meet the guidelines set forth in the Resident Life Posting Policy.  The Resident Life Posting Policy thus allows Dixie State administrators to censor flyers and posters with messages of which they do not approve.

**B.     Unconstitutional Free Speech Zone and Club Event Restrictions**

**1.     Defendants' Application of Ad Hoc Free Speech Zone Policy and Club Event Restrictions to Censor Plaintiffs' Free Speech Wall Event**

55.     Plaintiffs organize several events each year to draw attention to issues of concern to their members.  In fall 2014, Plaintiffs planned an event at which they would erect a "Free Speech Wall," consisting of over-sized blank sheets of paper on which students could write any message they desired to affirm constitutional free speech protections.

56.     Pursuant to the Dixie State Club Council Policies and Procedures ("Club Council Policies") (attached as Exhibit G), Plaintiffs were required to obtain permission to hold the event from various Dixie State administrators via an "Activity Approval Guide" form.  *See* Exhibit H.

57.     Plaintiffs complied with the various approval steps required by the Activity Approval Guide.  To process their Activity Approval Guide, Plaintiff Jergins obtained approvals from (a) Defendant Jordan Sharp, Dixie State's Director of Student Involvement and Leadership; (b) Defendant Sharon Lee, Dixie State's Coordinator of Academic Scheduling; (c) Corey Reeves, Dixie State's Director of Guest Services and the Kenneth N. Gardner Student Center ("Gardner Center"); and (d) Defendant Don Reid, Dixie State's Director of Public Safety. Plaintiffs obtained all necessary approvals at least three weeks prior to their scheduled event, as required by Dixie State policies.

58.     When reviewing Plaintiffs' Activity Approval Guide for the Free Speech Wall event, Defendant Sharp questioned Plaintiff Jergins regarding the nature of the event and marked "Free Speech Zone" on top of the Activity Approval Guide form.

59.     Although Plaintiff Jergins requested that the YAL event be held in a central area of the Dixie State campus known as the "Diagonal" (*see* Ex. I, campus map area outlined in yellow), Defendant Lee scheduled the Free Speech Wall event to occur in the Dixie State campus "Free Speech Zone" based on Defendant Sharp's designation on the Activity Approval Guide form.

60.     Defendant Lee initially asked Plaintiff Jergins what the Free Speech Zone was after reading Defendant Sharp's notation on the Activity Approval Guide form.  When Plaintiff

12

Jergins replied that he did not know, Defendant Lee called another administrator to ask where the area was located.

61.     As President of the Dixie State YAL chapter, Plaintiff Jergins attended a mandatory training for Dixie State student organization leaders.  The training did not discuss or in any way identify the Dixie State "Free Speech Zone."  Nor do any Dixie State policies or procedures for student club organizations.

62.      Plaintiffs came to learn that the Dixie State Free Speech Zone is a concrete patio adjacent to the Gardner Center, which houses various administrative offices and the student cafeteria.

63.     Because there are no classes in the Gardner Center, and no classroom buildings in the immediate area, Dixie State students have little reason to pass near the "Free Speech Zone."

64.     The Free Speech Zone is located on a side of the Gardner Center that only has doors to access an auditorium – the doors for the student cafeteria are on the other side of the building.

65.     The Dixie State Free Speech Zone is illustrated on the attached Dixie State Main Campus Map, outlined in red.  *See* Exhibit I.  Plaintiffs were not given clear guidelines on the perimeter of the Free Speech Zone, but they estimate that it is less than one-tenth of one percent of Dixie State's 100-acre campus.

66.     Although Dixie State does not appear to have a written policy, Plaintiffs were forced to hold their Free Speech Wall event in the Dixie State Free Speech Zone.

67.     Plaintiffs and other members of YAL held their Free Speech Wall event on October 27, 2014, from 9:00 a.m. to 2:00 p.m.  Plaintiffs observed minimal student foot traffic around and through the Free Speech Zone during their event.

68.     When Plaintiff Jergins sought approval for the Free Speech Wall event, Defendant Reid offered to provide a police presence to provide security during the event.

69.     Jergins declined the offer out of concern that having police observers would discourage student participation.

70.     Despite Plaintiff Jergins's request to not have police present, Doe Defendant 1, a member of campus security, attended the Free Speech Wall event for approximately 30 minutes.

71.     Doe Defendant 1 told a member of YAL that he was reading Plaintiffs' Free Speech Wall to look for "hate speech."

72.     During the 30 minutes that campus security monitored the event, student participation decreased even further.  Doe Defendant 1 remarked to Plaintiff Jergins and another YAL member that he "was probably scaring everyone away."

73.     The campus police presence was unnecessary and had a chilling effect on Plaintiffs' expressive rights as well as the rights of the other students involved in the event.

74.     Plaintiffs wish to engage in expressive activities on the Dixie State campus without being forced to conduct their activities in a Free Speech Zone.

## 2.     Club Event Policies

75.     The Dixie State club event policies function as a licensing scheme with which students must comply before engaging in the exercise of their free speech rights.

76.     Pursuant to the Club Council Policies, "[a]ny on campus club activity must be approved through the Club Council," which is comprised of Dixie State students, and supervised by Defendant Sharp.

77.     All club activities by Dixie State student clubs, other than club meetings, must be approved by at least four separate entities at the University:  the Director of Student Involvement and Leadership, the Director of Guest Services & Gardner Center, the Coordinator of Academic Scheduling, and the Public Safety Office.  The Activity Approval Guide provides a list of at least five required approvals, along with three optional approvals depending on whether the club activity will require event set-up services, food services, or a cash box.  *See* Exhibit H.

78.     The University has inconsistent timing requirements for student clubs to obtain approval in advance of on-campus events.  The Activity Approval Guide specifies that it "must be completed at least 3 weeks before the event."  However, the Club Council Policies state that such forms must be completed "two weeks in advance to any proposed activities."

79.      The Club Council Policies further provide that "[a]ny inter club activities held off-campus must have permission previously granted by the Director of Student Involvement and Leadership and DSU security."   The Off-Campus Activity Approval Guide requires clubs to obtain approvals from the Director of Student Involvement and Leadership, the club Advisor, and the Public Safety Office.  *See* Exhibit J.

80.     The Off-Campus Activity Approval Guide must be completed at least two weeks before the event.

81.     On their face, the Activity Approval Guide, Off-Campus Activity Approval Guide, and Club Council Policies (collectively, "Club Event Policies") do not limit the discretion of any administrator whose approval is required to deny approval to any proposed activity.

82.     Plaintiffs are aware of instances when approval for campus events was denied arbitrarily.  For example, in spring 2014 the Dixie State student club Students for Liberty sought permission to hold a water gun fight event to raise awareness of the Second Amendment.  Dixie State officials rejected the request.  In contrast, during fall 2014, a water gun fight event was approved for a student government event.

83.     Based on past arbitrary denials of club events at Dixie State, Plaintiffs' expression has been chilled.  For example, Plaintiffs planned an event to distribute literature critical of the United States' "War on Drugs."  To attract students to their table, Plaintiffs planned to offer "pot brownies" by offering regular brownies not containing any illegal substance to passersby from a cooking pot.  Plaintiffs were deterred from seeking approval of the event, however, because of past denials of club events at Dixie State based on Defendants' arbitrary review of the content of the event.

84.     The approval process for club activities imposes a prior restraint on Plaintiffs' expressive activities, as well as those of all other student club members not before this Court.  Plaintiffs' ability to engage in expressive activities has been hampered because the approval process is too bureaucratic and difficult to navigate.

85.     For example, in fall 2014 Plaintiffs sought permission from Defendant Sharp to hold a charity fundraising event approximately ten days before the event was to take place.  The event would have only required setting up one table on the Dixie State campus to engage with

students about Plaintiffs' charity fundraising efforts.  Plaintiffs cancelled their charity event because they found it impossible to obtain all of the required approvals from Dixie State administrators within ten days.

86.     Plaintiffs planned to hold events every month in fall 2014, but found that they could not do so because of the significant time and effort required to obtain approvals for each event.

87.     The Club Council Policies require all clubs and their members to comply with the University's event approval policies and states that club members "participating in violation of" such regulations "will be subject to individual disciplinary action."

88.     Plaintiffs wish to engage in expressive activities on and off the Dixie State campus without obtaining advance approval from University officials, but they have continued to submit to Dixie State's licensing scheme for fear of disciplinary action.

## VI.   CAUSES OF ACTION

### COUNT I
**As-Applied Violation of Plaintiffs' Rights to Free Speech Under
the First and Fourteenth Amendments (42 U.S.C. § 1983) – General Posting Policy
<u>(Defendants Beatty and Millet)</u>**

89.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

90.     The First and Fourteenth Amendments extend to campuses of state colleges and universities.  *Healy v. James*, 408 U.S. at 180.

91.     Defendants Beatty and Millet implemented the decision on whether to permit Plaintiffs to post Plaintiffs' three flyers, described, *supra*, at paragraphs 23-25 and attached hereto as Exs. A-C.

92.     Defendants denied approval of Plaintiffs' flyers because they "mocked individuals" in violation of Dixie State policies.

93.     As a direct result of Defendants' actions, Plaintiffs were unable to freely express their beliefs and their outreach efforts were curtailed for fear of being disciplined.

94.     Defendants' initial decision to deny Plaintiffs' request for approval of Plaintiffs' three flyers rested entirely on the content of the flyers, the images used, and the messages contained therein.  In this manner the decision was impermissibly content-based.

95.     Defendants Beatty and Millet violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.

96.     The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.  Additionally, Plaintiffs Jergins, Gillespie, and Gee experienced emotional injury as a consequence of being denied their First Amendment rights.

97.     Plaintiffs are entitled to a declaration that Defendants violated their First Amendment rights.  Additionally, they are entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**COUNT II**
**As-Applied Violation of Plaintiffs' Rights to Free Speech Under**
**the First and Fourteenth Amendments (42 U.S.C. § 1983) – Free Speech Zone Policy**
**(Defendants Sharp, Lee, Reid and Doe Defendant 1)**

98.     Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

99.     The First and Fourteenth Amendments extend to campuses of state colleges and universities.  *Healy v. James*, 408 U.S. at 180.

100.     Defendant Sharp reviewed Plaintiffs' Activity Approval Guide form for the YAL Free Speech Wall event and designated the event to take place in the Dixie State Free Speech Zone.

101.     Defendant Lee scheduled the Free Speech Wall event for the Free Speech Zone based on Defendant Sharp's designation on the Activity Approval Guide form.

102.     Defendants Sharp and Lee denied Plaintiffs' clearly established right to freedom of speech and expression secured by the First and Fourteenth Amendments to the Constitution of the United States by enforcing an *ad hoc* Free Speech Zone Policy to prevent Plaintiffs from holding their Free Speech Wall event outside the Dixie State's Free Speech Zone.

103.     Plaintiffs informed Defendant Reid that security would not be needed at their Free Speech Wall event.

104.     Nevertheless, Doe Defendant 1, a Dixie State security officer, monitored the event and caused students to avoid participating in the event.

105.     Doe Defendant 1 denied Plaintiffs' clearly established rights to freedom of speech and expression secured by the First and Fourteenth Amendments to the Constitution of the United States by monitoring and examining Plaintiffs' Free Speech Wall event for "hate speech." Doe Defendant 1's actions deterred Dixie State students from participating in the Free Speech Wall event and limited the effectiveness of Plaintiffs' speech.

106.     Defendants Sharp, Lee, Reid, and Doe Defendant 1 violated clearly established constitutional rights of which all reasonable college administrators and staff should have known, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.

107.    The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.  Additionally, Plaintiffs Jergins, Gillespie, and Gee experienced emotional injury as a consequence of being denied their First Amendment rights.

108.    Plaintiffs are entitled to a declaration that Defendants violated their First Amendment rights.  Additionally, they are entitled to damages in an amount to be determined by the evidence and this Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### COUNT III
### As-Applied Violation of Plaintiffs' Rights to Free Speech Under
### the First and Fourteenth Amendments (42 U.S.C. § 1983) – Club Event Policies
### (Defendant Sharp)

109.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

110.    The First and Fourteenth Amendments extend to campuses of state colleges and universities.  *Healy v. James*, 408 U.S. at 180.

111.    Defendant Sharp implemented Dixie State's Club Event Policies to require Plaintiffs to wait two to three weeks before speaking and to obtain permission from at least four entities at the University before holding any YAL event.

112.    Plaintiffs have navigated this process for past events, including seeking permission for their Free Speech Wall event.  However, because the process is cumbersome and time-consuming, Plaintiffs have had to limit the number of events they can sponsor.

113.    By requiring students to apply for permission to engage in expressive activities on or off the University campus, Defendant Sharp has imposed an unconstitutional prior restraint on free expression.

114.   Defendant Sharp violated a clearly established constitutional right of which all reasonable college administrators and staff should have known, rendering him liable to Plaintiffs under 42 U.S.C. § 1983.

115.   The denial of constitutional rights is irreparable injury *per se*, and Plaintiffs are entitled to declaratory and injunctive relief.  Additionally, Plaintiffs Jergins, Gillespie, and Gee experienced emotional injury as a consequence of being denied their First Amendment rights.

116.   Plaintiffs are entitled to a declaration that Defendants violated their First Amendment rights.  Additionally, they are entitled to damages in an amount to be determined by the evidence and this Court and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

### COUNT IV
### Facial Challenge to Violation of Right to Free Speech Under the Plaintiffs' First and Fourteenth Amendment Rights (42 U.S.C. § 1983) – Free Speech Zone Policy (Defendants Williams and Sharp)

117.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

118.   Through policy and practice Defendants have promulgated and enforced an *ad hoc* Free Speech Zone Policy that prohibits free expression on all but a tiny fraction of the Dixie College campus, despite the fact that the University has many open areas and sidewalks that are suitable for expressive activities.

119.   Restricting all First Amendment activity to a designated "Free Speech Zone" impermissibly restricts student expression, does not serve a significant government interest, and is unconstitutionally overbroad.

120.   Defendant Williams is responsible for Dixie State's administration and policy-making and has ultimate authority to approve the Free Speech Zone Policy challenged herein.

121.    Defendant Sharp oversees implementation and enforcement of the Free Speech Zone Policy challenged herein.

122.    As a legal consequence of the Defendants' violation of Plaintiffs' and other similarly situated students' First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**COUNT V**
**Facial Challenge to Posting Policies**
**Violation of Right to Free Speech Under**
**the First and Fourteenth Amendments (42 U.S.C. § 1983) – Prior Restraint**
**(Defendants Williams, Beatty, Millet, and Gubler)**

123.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

124.    Students have a First Amendment right to engage in expressive activities and to distribute written materials in the public areas of a state college without obtaining advance permission from government officials. *Widmar v. Vincent*, 454 U.S. 263, 267 n.5 (1981); *Papish v. Board of Curators of Univ. of Mo.*, 410 U.S. 667 (1973).

125.    Dixie State policies that require all students to obtain permission before posting or distributing flyers or other advertising materials on campus are an unconstitutional prior restraint.   Defendants' Posting Policies unconstitutionally subject the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969).

126.    Dixie State's Posting Policies unconstitutionally prohibit student organizations and students from engaging in spontaneous postings and/or promoting impromptu expressive

events due to the requirement to seek permission for posting two to three weeks before the event from the Dean of Students and an undefined period from the Office of Housing and Resident Life.

127.    A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality.  *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir. 2009); *Am. Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000)

128.    Advance notice and permitting requirements are presumptively invalid because of the significant burden they place on free speech.  The Supreme Court has labeled prior restraint of speech as "the essence of censorship."  *Near v. Minn.*, 283 U.S. 697, 713 (1931).  Such restrictions are "the most serious and the least tolerable on First Amendment rights."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

129.    Defendant Williams is responsible for Dixie State's administration and policy-making and has ultimate authority to approve the Posting Policies challenged herein.

130.    Defendants Beatty and Millet oversee implementation and enforcement of the General Posting Policy challenged herein.

131.    Defendant Gubler oversees implementation and enforcement of the Resident Life Posting Policy challenged herein.

132.    As a legal consequence of the Defendants' violation of Plaintiffs' and other similarly situated students' First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**COUNT VI**
**Facial Challenge to Club Events Policies**
**Violation of Right to Free Speech Under**
**the First and Fourteenth Amendments (42 U.S.C. § 1983) – Prior Restraint**
**(Defendants Williams and Sharp)**

133.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

134.    Defendants' Club Event Policies, which require all student groups to request permission two to three weeks in advance to engage in expressive activity other than regularly scheduled internal meetings, and to follow a cumbersome bureaucratic approval process, are an unconstitutional prior restraint.

135.    A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality.  Advance notice and permitting requirements are presumptively invalid because of the significant burden they place on free speech.

136.    Defendant Williams is responsible for Dixie State's administration and policy-making and has ultimate authority to approve the Club Event Policies challenged herein.

137.    Defendant Sharp oversees implementation and enforcement of the Club Event Policies challenged herein.

138.    As a legal consequence of the Defendants' violation of Plaintiffs' and other similarly situated students' First and Fourteenth Amendment rights, as alleged above, all of which is irreparable injury *per se*, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**COUNT VII**
**Facial Challenge to Posting Policies**
**Violation of Right to Free Speech Under**
**the First and Fourteenth Amendments (42 U.S.C. § 1983) – Vagueness**
**(Defendants Williams, Beatty, Millet, and Gubler)**

139.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

140.   Restrictions on expressive activity are void for vagueness if their terms are not clearly defined such that a person of ordinary intelligence can readily identify the standards to be applied.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

141.   The General Posting Policy is vague insofar as it states that "[m]aterials must be in good taste (FCC guidelines), adhere to campus policy, look professional, and not detract from the campus appearance," and "may not single out an individual group(s) or entities in a derogatory manner," without defining those standards.

142.   Dixie State's General Posting Policy lacks criteria to guide Defendant Beatty and Defendant Millet's decisions whether to approve posters and gives them the authority to deny approval for failure of posters to comport with undefined requirements.

143.   The Resident Life Posting Policy is vague insofar as it states that materials may not be "racist, sexist, indecent, scandalous, illegal, inciting, advertising alcohol or illegal substances, or in any way oppressive in nature," and that materials may not be "offensive, inappropriate or demeaning, or could cause damage, an uncomfortable or threatening environment for staff, employees, residents, or members of the community," without defining those standards.

25

144.    Dixie State's Resident Life Posting Policy lacks criteria to guide Defendant Gubler's decisions whether to approve posters and gives him the authority to deny approval for failure of posters to comport with undefined requirements.

145.    Defendant Williams is responsible for Dixie State's administration and policy-making and has ultimate authority to approve the Posting Policies challenged herein.

146.    Defendants Beatty and Millet oversee implementation and enforcement of the General Posting Policy challenged herein.

147.    Defendant Gubler oversees implementation and enforcement of the Resident Life Posting Policy challenged herein.

148.    As a direct result of the Defendants' Posting Policies, student groups and students at Dixie State are deprived of their right to free speech under the First and Fourteenth Amendments to the Constitution.

149.    Violation of Plaintiffs' First and Fourteenth Amendment rights is irreparable injury *per se*.  Consequently, Plaintiffs are entitled to declaratory and injunctive relief, damages, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## COUNT VIII
## Declaratory Judgment and Injunction (28 U.S.C. § 2201, et seq.)

150.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

151.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiffs' rights under the United States Constitution.  A judicial declaration is necessary and appropriate at this time as to Counts I through VII above.

152.    Plaintiffs desire a judicial determination of their rights against Defendants as they pertain to Plaintiffs' right to speak without being subjected to content-based requirements,

Posting Policies, a Free Speech Zone Policy, and/or Club Event Policies that impose prior restraints on speech, give school officials unlimited discretion whether to allow expression and under what conditions, and that are vague, overbroad, and that are not narrowly tailored to serve a substantial governmental interest.

153.    To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring Dixie State University's Posting Policies, Free Speech Zone Policy, and Club Event Policies unconstitutional.

154.    Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction prohibiting the Defendants from enforcing their restrictions on Plaintiffs' expressive activities to the extent they are unconstitutional, to prevent the ongoing violation of Plaintiffs' constitutional rights.  Plaintiffs and their fellow student clubs and students are suffering irreparable harm from continued enforcement of Dixie State's unconstitutional policies, monetary damages are inadequate to remedy their harm, and the balance of equities and public interest both favor a grant of injunctive relief.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs William Jergins, Joey Gillespie, and Forrest Gee respectfully request that the Court enter judgment against Defendants and provide Plaintiffs the following relief:

A.      A declaratory judgment stating that Defendants' Posting Policies, Free Speech Zone Policy, and Club Event Policies facially and as-applied to Plaintiffs are unconstitutional

and that they violate the Plaintiffs' rights as guaranteed under the First and Fourteenth Amendments to the United States Constitution;

B.      A permanent injunction restraining enforcement of Defendants' unconstitutional Posting Policies, Free Speech Zone Policy, and Club Events Policy and their underlying enforcement practices;

C.      A declaratory judgment that Defendants' censorship of Plaintiffs' expressive activities violated their First and Fourteenth Amendment rights;

D.      Monetary damages in an amount to be determined by the Court to compensate Plaintiffs for the impact of a deprivation of fundamental rights;

E.      Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees, in accordance with 42 U.S.C. § 1988, and other applicable law; and

F.      All other further relief to which Plaintiffs may be entitled.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all issues properly triable by jury in this action.

DATED:  March 4, 2015

                                    Respectfully submitted,


                                    _____/s/_____

                                    JEROME H. MOONEY
                                    WESTON, GARROU & MOONEY
                                    12121 Wilshire Blvd., Suite 525
                                    Los Angeles, CA 90025
                                    (310) 442-0072

                                    Robert Corn-Revere (*pro hac vice pending*)
                                    bobcornrevere@dwt.com
                                    Ronald G. London (*pro hac vice pending*)
                                    ronnielondon@dwt.com

Lisa B. Zycherman (*pro hac vice pending*)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006-3401
(202) 973-4200


Attorneys for Plaintiffs Williams Jergins,
Joey Gillespie, and Forrest Gee